AO93 Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| In the Matter of the Search of | Case No. 22-3327MB |
|---|---|

a. One (1) black, iPhone, (hereinafter Target Device #1 or TD #1)

b. One (1) Silver, iPhone, (hereinafter Target Device #2 or TD #2)

c. One (1) blue, iPhone 12, (hereinafter Target Device #3 or TD #3)

d. One (1) red, iPhone XR, (hereinafter Target Device #4 or TD #4)

e. One (1) blue, iPhone 13, (hereinafter Target Device #5 or TD #5)

f. One (1) black, Motorola, (hereinafter Target Device #6 or TD #6)

USAO #:  2022R05015

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of Arizona:

### As further described in Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### As set forth in Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 10-14-22 *(not to exceed 14 days)* ☐ in the daytime 6:00 a.m. to 10:00 p.m. ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>any United States Magistrate Judge on criminal duty in the District of Arizona.</u>

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized ☐ for _30_ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: 9-30-22 @ 10:02 A.M.     M Morrissey
                                          *Judge's signature*

City and state: <u>Phoenix, Arizona</u>          <u>Honorable Michael T. Morrissey, U.S. Magistrate Judge</u>
                                          *Printed name and title*



## ATTACHMENT A

The property to be searched is:

One (1) black, iPhone, model unknown, International Mobile Equipment Identity (IMEI) number unknown, and seized as evidence on September 21, 2022, from Keivin CROSSWELL Cervantes (hereinafter referred to as, "**TD#1**"); currently in the custody of Homeland Security Investigations Nogales.

 

One (1) silver, iPhone, model unknown, International Mobile Equipment Identity (IMEI) number unknown, and seized as evidence on September 21, 2022, from Keivin CROSSWELL Cervantes (hereinafter referred to as, "**TD#2**"); currently in the custody of Homeland Security Investigations Nogales.

 

1

One (1) blue, iPhone 12, International Mobile Equipment Identity (IMEI) number unknown, and seized as evidence on September 21, 2022 from Carlos CASTRO Ruiz (hereinafter referred to as, "**TD #3**"); currently in the custody of Homeland Security Investigations Nogales.



One (1) red, iPhone XR, International Mobile Equipment Identity (IMEI) number unknown, and seized as evidence on September 21, 2022 from Carlos CASTRO Ruiz (hereinafter referred to as, "**TD#4**"); currently in the custody of Homeland Security Investigations Nogales.



One (1) black, Motorola, model unknown, International Mobile Equipment Identity (IMEI) number unknown, and seized as evidence on September 21, 2022 from Carlos CASTRO Ruiz (hereinafter referred to as, "**TD#6**"); currently in the custody of Homeland Security Investigations Nogales.



One (1) blue, iPhone 12, International Mobile Equipment Identity (IMEI) number unknown, and seized as evidence on September 21, 2022, from Alexander ORTEGA Islas (hereinafter referred to as, "**TD #5**"); currently in the custody of Homeland Security Investigations Nogales.



**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEARCHED FOR**

1.      Data and/or digital files stored on or accessed through **TD#1, TD #2, TD #3, TD #4, TD #5,** and/or **TD #6** (as described in Attachment A) relating to drug-trafficking, wherever it may be stored or found, specifically including:

a.      lists of customers and related identifying information;

b.      types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;

c.      types, amounts of money obtained, received, exchanged, deposited, withdrawn, or delivered as well as dates, places, exchange rates, and amounts of specific transactions;

d.      any information related to sources of money or narcotic drugs (including names, addresses, phone numbers, or any other identifying information);

e.      all bank records, checks, credit card bills, account information, and other financial records stored on or accessed through **TD#1, TD #2, TD #3, TD #4, TD #5,** and/or **TD #6** relating to drug-trafficking.

2.      Electronic correspondence stored on or accessed through **TD#1, TD #2, TD #3, TD #4, TD #5,** and/or **TD #6** relating to drug-trafficking, to include emails and attached files, text messages, and instant messaging logs.

3.      Information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on or accessed through **TD#1, TD #2, TD #3, TD #4, TD #5,** and/or **TD #6.**

4.      Contact lists stored on or accessed through **TD#1, TD #2, TD #3, TD #4, TD #5,** and/or **TD #6,** to include telephone and email contact names, telephone numbers, addresses, and email addresses.

5.      Evidence of persons who used, owned, or controlled **TD#1, TD #2, TD #3, TD #4, TD #5,** and/or **TD #6.**

6.      Logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, electronic correspondence, and telephone contact lists stored or accessed through **TD#1, TD #2, TD #3, TD #4, TD #5,** and/or **TD #6.**

AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| In the Matter of the Search of | Case No. 22-3327 MB |
|---|---|

a.  One (1) black, iPhone, (hereinafter Target Device #1 or TD #1)

b.  One (1) Silver, iPhone, (hereinafter Target Device #2 or TD #2)

c.  One (1) blue, iPhone 12, (hereinafter Target Device #3 or TD #3)

d.  One (1) red, iPhone XR, (hereinafter Target Device #4 or TD #4)

e.  One (1) blue, iPhone 13, (hereinafter Target Device #5 or TD #5)

f.  One (1) black, Motorola, (hereinafter Target Device #6 or TD #6)

USAO #:  2022R05015

### APPLICATION FOR A SEARCH WARRANT

I, Daniel Thomas, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

### As further described in Attachment A

located in the District of Arizona, there is now concealed:

### As set forth in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Possession with Intent to Distribute |
| 21 U.S.C. § 846 | Conspiracy to Distribute |

The application is based on these facts:

### See attached Affidavit of Special Agent Daniel Thomas, HSI

☒ Continued on the attached sheet.

☐ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Matthew G. Eltringham

MATTHEW ELTRINGHAM
Digitally signed by MATTHEW ELTRINGHAM
Date: 2022.09.28 16:21:18 -07'00'

DANIEL J THOMAS
Digitally signed by DANIEL J THOMAS
DN: cn=DANIEL J THOMAS, o=U.S. Government, ou=People, email=Daniel.J.Thomas@ice.dhs.gov, c=US
Date: 2022-09-28T15:56:32-0700

_Applicant's Signature_

Daniel Thomas, HSI Special Agent
_Printed name and title_

Subscribed and Sworn to telephonically.

Date: 9-30-22 @ 10:02 A.M          M Morrissey
_Judge's signature_

City and state: Phoenix, Arizona          Honorable Michael T. Morrissey, U.S. Magistrate Judge
_Printed name and title_

SCANNED

## ATTACHMENT A

The property to be searched is:

One (1) black, iPhone, model unknown, International Mobile Equipment Identity (IMEI) number unknown, and seized as evidence on September 21, 2022, from Keivin CROSSWELL Cervantes (hereinafter referred to as, "**TD#1**"); currently in the custody of Homeland Security Investigations Nogales.

 

One (1) silver, iPhone, model unknown, International Mobile Equipment Identity (IMEI) number unknown, and seized as evidence on September 21, 2022, from Keivin CROSSWELL Cervantes (hereinafter referred to as, "**TD#2**"); currently in the custody of Homeland Security Investigations Nogales.

 

1

One (1) blue, iPhone 12, International Mobile Equipment Identity (IMEI) number unknown, and seized as evidence on September 21, 2022 from Carlos CASTRO Ruiz (hereinafter referred to as, "**TD #3**"); currently in the custody of Homeland Security Investigations Nogales.



One (1) red, iPhone XR, International Mobile Equipment Identity (IMEI) number unknown, and seized as evidence on September 21, 2022 from Carlos CASTRO Ruiz (hereinafter referred to as, "**TD#4**"); currently in the custody of Homeland Security Investigations Nogales.



One (1) black, Motorola, model unknown, International Mobile Equipment Identity (IMEI) number unknown, and seized as evidence on September 21, 2022 from Carlos CASTRO Ruiz (hereinafter referred to as, "**TD#6**"); currently in the custody of Homeland Security Investigations Nogales.



One (1) blue, iPhone 12, International Mobile Equipment Identity (IMEI) number unknown, and seized as evidence on September 21, 2022, from Alexander ORTEGA Islas (hereinafter referred to as, "**TD #5**"); currently in the custody of Homeland Security Investigations Nogales.

 

## ATTACHMENT B
## DESCRIPTION OF ITEMS TO BE SEARCHED FOR

1.      Data and/or digital files stored on or accessed through **TD#1, TD #2, TD #3, TD #4, TD #5**, and/or **TD #6** (as described in Attachment A) relating to drug-trafficking, wherever it may be stored or found, specifically including:

      a.      lists of customers and related identifying information;

      b.      types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;

      c.      types, amounts of money obtained, received, exchanged, deposited, withdrawn, or delivered as well as dates, places, exchange rates, and amounts of specific transactions;

      d.      any information related to sources of money or narcotic drugs (including names, addresses, phone numbers, or any other identifying information);

      e.      all bank records, checks, credit card bills, account information, and other financial records stored on or accessed through **TD#1, TD #2, TD #3, TD #4, TD #5**, and/or **TD #6** relating to drug-trafficking.

2.      Electronic correspondence stored on or accessed through **TD#1, TD #2, TD #3, TD #4, TD #5**, and/or **TD #6** relating to drug-trafficking, to include emails and attached files, text messages, and instant messaging logs.

3.      Information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on or accessed through **TD#1, TD #2, TD #3, TD #4, TD #5**, and/or **TD #6**.

4.      Contact lists stored on or accessed through **TD#1, TD #2, TD #3, TD #4, TD #5**, and/or **TD #6**, to include telephone and email contact names, telephone numbers, addresses, and email addresses.

5.      Evidence of persons who used, owned, or controlled **TD#1, TD #2, TD #3, TD #4, TD #5**, and/or **TD #6**.

6.      Logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, electronic correspondence, and telephone contact lists stored on or accessed through **TD#1, TD #2, TD #3, TD #4, TD #5**, and/or **TD #6**.

1

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your affiant, Daniel J. Thomas, Special Agent with Homeland Security Investigations (HSI), being duly sworn, does depose and state the following:

## INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the Homeland Security Investigations (HSI) in Nogales, Arizona and have been so employed since September 2019. As such, I am an investigative law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. Prior to joining HSI, I was employed as a Border Patrol Agent in McAllen, Texas and Nogales, Arizona since 2013. Prior to joining Border Patrol, I was employed as a Police Officer of the Merrillville Police Department, Indiana, since 2008.

2.     As a Special Agent for HSI, I am responsible for investigating laws enumerated in Title 8, Title 18, and Title 21 of the United States Code. Included in my responsibilities are the investigation of illicit contraband-smuggling, including narcotics smuggling, across the United States border. In preparing to become a Special Agent, I attended the Basic Criminal Investigator and the HSI Special Agent training programs at the Federal Law Enforcement Training Center in Glynco, Georgia.

3.     During my career in law enforcement, I have participated in multiple investigations involving illegal drugs, bulk cash smuggling, and weapons. During these investigations, I have been involved in seizures of cocaine, heroin, methamphetamine and

prohibited pharmaceuticals, and other illicit or controlled substances. I have assisted in the interrogation of numerous subjects/defendants involved in and/or arrested for drug and narcotics violations. I also participated in several joint interagency federal and state investigations. In the course of these investigations, I conducted thorough background checks of targets, conducted physical surveillance, and monitored and reviewed recorded conversations of drug traffickers.

4.      The statements contained in this affidavit are based on my experience and background as a law enforcement officer and, in part, on information provided by other law enforcement officers, records obtained by those officers and corresponding summaries. I am familiar with the information submitted in this affidavit. As this affidavit is submitted for a limited purpose, it does not recite all aspects of this investigation, but only sufficient information to establish probable cause in support of the issuance of this search warrant.

## PURPOSE OF AFFIDAVIT

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, which is an electronic device, specifically a cellular telephone described as:

      a. One (1) black, iPhone, (hereinafter **Target Device #1** or **TD #1**)

      b. One (1) Silver, iPhone, (hereinafter **Target Device #2** or **TD #2**)

      c. One (1) blue, iPhone 12, (hereinafter **Target Device #3** or **TD #3**)

      d. One (1) red, iPhone XR, (hereinafter **Target Device #4** or **TD #4**)

      e. One (1) blue, iPhone 13, (hereinafter **Target Device #5** or **TD #5**)

   f. One (1) black, Motorola, (hereinafter **Target Device #6** or **TD #6**)

  4. As further noted below, I submit that there is probable cause to believe that **TD #1, TD #2, TD #3, TD #4, TD #5**, and **TD #6** contain evidence, as more fully set forth in Attachment B, of the activities, which occurred during and in relation to the commission of violations of Title 21, United States  Code, Section 841: Possession with Intent to Distribute Controlled Substances, and Title  21, United States Code, Section 846: Conspiracy to Distribute Controlled Substances. Further, I submit there is probable cause to believe that **TD #1, TD #2, TD #3, TD #4, TD #5**, and **TD #** also contain evidence, fruits and instrumentalities of these crimes as well as the identities of persons involved, as more fully described in this search warrant and the attachments.  The applied for warrant is to authorize a forensic examination of **TD #1, TD #2, TD #3, TD #4, TD #5**, and **TD #6** as described in Attachment A for the purpose of identifying electronically stored data as described in Attachment B.

6. **TD #1, TD #2, TD #3, TD #4, TD #5**, and **TD #6** are currently in the custody of HSI, at the HSI Office in Rio Rico, Arizona. As further noted below, **TD #1, TD #2, TD #3, TD #4, TD #5**, and **TD #6** were seized after the arrest of Keivin CROSSWELL Cervantes, Carlos CASTRO Ruiz and Alexander ORTEGA Islas on September 21, 2022, by HSI Nogales and the HSI Special Response Team (SRT). As such, HSI personnel-maintained custody of the cellphone in accordance with agency policy and procedure.

  7. The requested warrant would authorize the forensic examination of **TD #1, TD #2, TD #3, TD #4, TD #5**, and **TD #6** for the purpose of identifying electronically

stored data to include: any telephone numbers, including but not limited to numbers called, numbers stored for speed dial, pager numbers, names and addresses, electronically stored voice and text messages, calling card numbers, text messages, photos, videos and/or identifying information that may be stored in the memory of **TD #1**, **TD #2**, **TD #3**, **TD #4**, **TD #5**, and **TD #6** for the items described in Attachment A (incorporated herein by reference).

## BACKGROUND ON SMARTPHONES

8.      Based upon my knowledge, training, and experience, as well as information related to me by law enforcement officers and others experienced in the forensic examination of electronic communication devices, I know that certain types of cellular telephones referred to as "smartphones" (such as **TD #1**, **TD #2**, **TD #3**, **TD #4**, **TD #5**, and **TD #6**) generally offer more advanced computing ability and internet connectivity than standard cellular telephones. Provided that internet access has been purchased through an electronic communication service provider for a particular smartphone, a smartphone is capable of running complete operating system software, has full access to the internet and/or electronic mail (including file attachments), is capable of text and instant messaging, can create and edit documents created with computer software, is capable of storing large amounts of data, and can be interfaced with desktop and laptop computers.

9.      As described in Attachment B hereto, this affidavit seeks permission to locate not only data files that might serve as direct evidence of the crimes described in the warrant, but also for evidence that establishes which individual(s) used the device as well as the

purpose of their use. Additionally, this affidavit seeks information about the possible location of other evidence.

10.     As described in Attachment B hereto, this affidavit also seeks permission to search and seize certain electronic records that might be stored within the device. Some of these electronic records might take the form of files, documents, or other data that are user generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

11. Although some of the records requested in this affidavit might be found in the form of user-generated documents (such as electronic format documents, picture, and movie files), electronic communication devices (such as **TD #1, TD #2, TD #3, TD #4, TD #5**, and **TD #6**) can contain other forms of electronic evidence that are not user-generated. In particular, an electronic communication device may contain records of how it has been used and/or the person(s) who utilized the electronic communication device. Based upon my knowledge, training, experience, as well as information related to me by law enforcement officers and other persons involved in the forensic examination of electronic communication devices, I know that:

a.     Data on electronic communication devices not currently associated with any file can provide evidence of a file that was once on the electronic communication device, but has since been deleted or edited, or of a deleted portion of a file;

b.      Virtual memory paging systems can leave traces of information on an electronic communication device that can be used to determine what tasks and processes were recently in use;

c.      Web browsers, e-mail programs, social media platforms, and chat programs store configuration information on the electronic communication devices that can reveal information such as online nicknames and passwords;

d.      Operating systems can record additional information, such as the attachment of peripheral electronic devices, and the number of occasions in which the peripheral electronic devices were accessed;

e.      Computer file systems can record information about the dates that files were created and the sequence in which they were created. This information may be evidence of a crime and/or indicate the existence and/or location of evidence in other locations on the electronic communication device;

f.      When an electronic communication device has more than one user, files can contain information indicating the dates and times that the files were created as well as the sequence in which the files were created, and whether a particular user accessed other information close in time to the file creation dates, times, and sequences;

g.      The types of evidence described above may be direct evidence of a crime, indirect evidence of a crime indicating the location of evidence or a space where evidence was once located, contextual evidence identifying an electronic communication device user, and contextual evidence excluding an electronic communication device user. All of

these types of evidence may indicate ownership, knowledge, and intent to commit a given offense;

h.     The foregoing type of evidence is not "data" that can be segregated, that is, this type of information cannot be abstractly reviewed and filtered by a seizing or imaging agent and then transmitted to investigators. Rather, evidence of this type is a conclusion, based on a review of all available facts and the application of knowledge about how electronic communication devices operate and how electronic communication devices are used. Therefore, contextual information necessary to understand the evidence to be seized, as described in Attachment B also falls within the scope of the warrant.

## CHARACTERISTICS OF INDIVIDUALS INVOLVED IN
## DRUG TRAFFICKING ORGANIZATIONS

12.     Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the activities of drug smugglers and drug trafficking distribution networks.  I became familiar with the manner in which drug traffickers smuggle, package, transport, store, and distribute drugs as well as how they collect and launder drug proceeds.  I am also familiar with the manner in which drug traffickers use telephones, cellular telephone technology, internet, pagers, coded communications, and slang-filled conversations, false and fictitious identities and other means to facilitate their illegal activities and mislead law enforcement investigations.

13.     Over the course of my experience in law enforcement, I learned that individuals involved in drug trafficking often:

a.     use vehicles, typically containing secret compartments, as a means to distribute drugs and drug proceeds;

b.     use the United States Postal Service as well as private courier services such as United Parcel Service ("UPS") as a means to distribute drugs and drug proceeds;

c.     physically handle and count money after receiving it in exchange for drugs, thereby leaving residue traces of controlled substances on the money;

d.     maintain, use or employ firearms and ammunition in connection with their drug trafficking activities;

e.     drug couriers are often paid to transport the controlled substances;

f.     drug couriers often use different navigational applications when transporting controlled substances;

g.     drug coordinators often communicate with the drug couriers to track the progress of the trafficking activities;

h.     maintain in secure locations over which they have control (e.g., stash houses) large amounts of currency to finance their ongoing illicit business;

i.     attempt to conceal the true origins of the proceeds of unlawful activity by engaging in various money laundering techniques, e.g., by creating shell corporations; using the services of attorneys, bankers, and accountants; establishing "front" businesses; and purchasing and/or titling their assets in fictitious names, aliases or in the names of relatives, associates, or business entities, to avoid detection of these assets by law

8

enforcement agencies; and, although these assets are in other names, traffickers actually own and continue to use these assets and exercise dominion and control over them;

      j.     use all the available features of electronic devices such as cellular telephones, including using third-party messaging applications such as WhatsApp or Facebook, to facilitate communication between and among criminal associates and to document their criminal activities, e.g., by sending messages about and taking photographs and video of drugs, bulk currency, firearms, and other involved persons, vehicles, and locations; often such electronic evidence will contain embedded metadata that reveals the dates, times, and locations (e.g., GPS coordinates) of criminal activity;

      k.     maintain in secure locations over which they have control (e.g., stash houses) drugs; paraphernalia; firearms; and drug proceeds, which proceeds include domestic and foreign currency, financial instruments such as money orders or cashier's checks, physical objects such as jewelry, vehicles, and electronics; and records relating to the purchase of these and other assets purchased with the proceeds of unlawful activity and/or as a means to conceal unlawful activity; and

      l.     maintain in secure locations over which they have control (e.g., stash houses) physical and electronic documents relating to the sale and distribution of drugs and drug proceeds, and related money laundering activities, with such documents including, but not being limited to, receipts, ledgers, tickets, books, financial records, bank and credit account records, wire transfer records, real estate records, identification documents, contact lists

recording names, addresses and telephone numbers of criminal associates, photographs and videos, and vehicle title and registration documents.

## PROBABLE CAUSE

14.     On September 21, 2022, HSI Nogales conducted a buy-bust operation in Avondale, Arizona. HSI Special Agents (SAs), acting in an undercover agents (UCA's) capacity, negotiated the purchase of controlled substances from Keivin CROSSWELL Cervantes.

15.     The UCA and CROSSWELL agreed that CROSSWELL would deliver 200,000 blue fentanyl pills, 200,000 colored fentanyl pills (a.k.a. "skittles"), 25 pounds of methamphetamine, 4 kilograms of fentanyl powder and one (1) kilogram of cocaine and the UCA would pay CROSSWELL $355,000. CROSSWELL contacted the UCA several times and spoke to the UCA about not wanting to bring all the controlled substances at once. The UCA and CROSSWELL agreed they could do two (2) separate deliveries and the first one would consist of the 400,000 fentanyl pills and the 25 pounds of methamphetamine.

16.     On September 21, 2022, agents began surveillance at CROSSWELL-Cervantes' suspected residence at the Cordova Apartments near building three (3). At approximately 10:06 a.m. A maroon Kia Sorento, pulled into the parking lot, near building three. The driver could not be positively identified but the subject went into an unknown apartment near building three. At approximately 12:28 p.m. CROSSWELL walked by building three, entered the driver seat of the Kia and departed the area.

17.     During this time CROSSWELL contacted the UCA and told the UCA he was going to an unknown location to pick up the rest of the fentanyl pills. At approximately 1:50 p.m. CROSSWELL returned to the Cordova apartments. In the parking lot, CROSSWELL met with unknown subjects in a blue Nissan Sentra and a silver Chevrolet Silverado z71. They placed a large container/bag into the backseat of the Silverado. The driver of the Silverado, later identified as Carlos Alberto CASTRO Ruiz, exited the Silverado and had a handgun in the small of his back. CASTRO got into the driver seat of the maroon Kia and CROSSWELL was in the passenger seat. Another vehicle, a silver two door Kia, pulled into the apartment complex near CROSSWELL and one of the occupants placed a box in the back of the maroon Kia.

18.     A short time later the maroon Kia left the parking lot and was followed by the Silverado, which was followed by the two door Kia. All three vehicles drove in tandem to the area where CROSSWELL was to meet the UCA's. This location, Homewood Suites 11450 W. Hilton Drive Avondale, Arizona, was approximately a ten-minute drive, utilizing Interstate 10.  Surveillance followed the three vehicles as they drove in tandem until they reached the area of the meet.

19.     The maroon Kia arrived at the meet location, while the 2-door Kia and the Silverado parked near Dutch Bros Coffee, 888 N. 114th Ave., Avondale, Arizona 85323. CROSSWELL exited the passenger seat of the Kia and met with the UCA.  CROSSWELL showed the UCA the methamphetamine and fentanyl pills he had in the vehicle and confirmed the remainder of the fentanyl pills were in the other truck, Silverado. Agents

11

attempted to apprehend CASTRO and CROSSWELL at this time. CASTRO obeyed the agents' commands and was placed into custody, but CROSSWELL attempted to flee on foot southbound. CROSSWELL was apprehended after a short pursuit.  CROSSWELL attempted to break a cellular telephone, **TD #2**, he had in his possession by throwing it on the ground.  The screen of **TD #2** cracked but appears to still function.

20.    Agents located the Silverado turning northbound on Avondale Rd, near the Dutch Bros Coffee. The Silverado traveled northbound on Avondale Rd and stopped at a red traffic control device at Interstate 10.  Agents activated their emergency lights and sirens and approached the Silverado. The driver, later identified as Alexander ORTEGA Islas, drove the Silverado forward but stopped because he was blocked in by agents and bystanders. Agents removed ORTEGA from the vehicle and located a handgun in the gap in the seat between the driver seat and center seat. There was an AK-47 style pistol on the floorboard under the radio, with two magazines for this gun in the cup holder of the center counsel. A large black bag was in the backseat of the Silverado with a large quantity of suspected blue fentanyl pills.

21.    The two door KIA fled the scene and was last seen eastbound on Interstate 10 from Avondale.

22.    All evidence, vehicles and subjects were taken to Tolleson Police Department, 8350 W. Van Buren St, Tolleson, AZ 85353, for processing.  ORTEGA and CROSSWELL both requested lawyers and were not questioned besides for processing questions.

23.     During a post-*Miranda* interview of CASTRO he admitted to helping CROSSWELL deliver a large quantity of controlled substance to an unknown individual. CASTRO told agents that the previous evening, September 20, 2022, CROSSWELL contacted him via their cellular telephones and asked CASTRO if he wanted to work. CASTRO said he knew this to mean he wanted CASTRO to assist him with delivering controlled substances. CASTRO agreed to help CROSSWELL and told agents CROSSWELL was going to pay him $1,000 for helping him. CASTRO told agents that he arrived at the CORDOVA apartment complex parking lot driving his Silverado, same Silverado that ORTEGA was apprehended later in the day. CASTRO told agents CROSSWELL was not there, but CROSSWELL arrived a short time later, along with the other two KIAs.

24.     CASTRO told agents that CROSSWELL asked him to drive him in the Maroon KIA Sorento because he was too busy talking on both of his cellular phones arranging the "deals". CASTRO also said a vehicle pulled near them and a subject placed a box of suspected methamphetamine in the rear of their KIA. CASTRO said CROSSWELL told him the box had "waters", which is a common street name for crystal methamphetamine. CASTRO also said that CROSSWELL told him he had pills in the rear of the vehicle inside a piece of luggage. CASTRO told agents he knew CROSSWELL was referring to fentanyl pills.

25.     Both vehicles seized, Silverado and KIA, are registered to CASTRO. CASTRO told agents CROSSWELL paid him $500 to register the KIA in his, CASTRO's, but the KIA belonged to CROSSWELL.

26.     Record checks performed on CROSSWELL revealed he is illegal present in the United States and does not have any immigration documents permitting him to stay lawfully in the United States.

27.     Agents seized approximately 11.6 kilograms (or approximately 25.6 pounds) of suspect crystal methamphetamine, 5.4 kilograms of suspected blue fentanyl pills (approximately 54,000 pills), 2 kilograms of suspected multicolored fentanyl pills (approximately 20,000 pills), a Kimber 1911 pistol with two magazines, along with several cellular telephones from maroon KIA Sorento.  This is the vehicle CROSSWELL and CASTRO used to travel to the meeting with the UCA.

28.     Agents seized approximately 36 kilograms of suspected fentanyl blue pills (approximately 360,000 pills)], a FN pistol, an AK-47 style pistol, 3 loaded AK-47 magazines, 1 loaded magazine for FN pistol and several cellular telephones from the Silverado. ORTEGA was the driver of this vehicle.

29.     It is noteworthy, that all the seized firearms were loaded and had a bullet in the chamber.  Additionally, the Kimber 1911's hammer was cocked back.  Based on my training and experience, I know that all of these weapons were ready to fire if any of the defendant's chose to do so.

30.     Due to safety protocols, the fentanyl pills and methamphetamine were not tested at the scene. However, based on my training, experience, and knowledge of this investigation, the suspected fentanyl pills were consistent in size, shape, and color to fentanyl pills I have previously seized. Also, based on my training, experience, and knowledge of this investigation, the suspected methamphetamine is consistent in size, shape, and color to methamphetamine I have previously seized. On September 22, 2022, samples of the suspected fentanyl and methamphetamine were taken to Laboratory and Science Services (LSS) at the Mariposa Port of Entry for preliminary testing and the results are pending. On September 26, 2022, the remainder of fentanyl and methamphetamine were transported to the DEA Southwest Regional Laboratory for storage and chemical analysis.

31.     **TD #1** and **TD #2** were in CROSSWELL's possession when he was apprehended. **TD #3** and **TD #4** were in CASTRO's possession when he was arrested. **TD #5** was in ORTEGA's possession upon his arrest. **TD #6** was in the driver's door pocket of the maroon Kia, which CASTRO was driving and is registered to him. However, during a post-*Miranda* interview CASTRO stated the vehicle is CROSSWELL's.

32.     Based on my training and experience, I know that drug traffickers use cellular devices to communicate and coordinate the distribution of narcotics for traffickers.

33.     Since the date of the arrest, **TD #1**, **TD #2**, **TD #3**, **TD #4**, **TD #5**, and **TD #6** have been stored in a secure evidence location within HSI-Nogales. **TD #1**, **TD #2**, **TD #3**, **TD #4**, **TD #5**, and **TD #6** have been stored in such a manner that its contents, to the

best of my knowledge, are in substantially the same state as when they first came into possession of HSI.

## **TECHNICAL TERMS**

34.     Wireless telephone: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

35.     Digital camera: A digital camera is a camera that records pictures and video as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of

flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

36.     Portable media player. A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock or games. Most cell phones currently manufactured contain portable medial players as a standard feature.

37.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

38.    Based on my training, experience, research, and from consulting the manufacturer's advertisements and product technical specifications available online for these types of cellular phones, and based upon my discussions with experts, I know that the cellular phones which are the subject of this search warrant application most likely have capabilities that allow them to also serve as a radio communication transmitter, wireless telephone, GPS device, wireless internet connectivity, and text message capabilities, as these are generally standard features. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

39.    Based on my knowledge, training and experience, I know that electronic devices such as **TD #1, TD #2, TD #3, TD #4, TD #5,** and **TD #6** in this case, can store information for long periods of time.  Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period of time on the device. Additionally, computer files or remnants of such files can be recovered even if they have

been deleted. This is because when a person "deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

40.     As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **TD #1, TD #2, TD #3, TD #4, TD #5,** and **TD #6** was used, where they were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on **TD #1, TD #2, TD #3, TD #4, TD #5,** and **TD #6** are more fully set forth in the factual section contained herein and because:

A.     Data on the storage medium can provide evidence of a file that was once on thestorage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

B.     Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C.     A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user(s) of **TD #1**, **TD #2**, **TD #3**, **TD #4**, **TD #5**, and **TD #6** did not have a relationship with the party.

28. The examination of **TD #1**, **TD #2**, **TD #3**, **TD #4**, **TD #5**, and **TD #6** may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. Because this warrant only seeks permission to examine a device already in the possession of HSI, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, there is probable cause for the Court to authorize execution of the warrant at any time in the day or night. Due to the nature of such cell phones, data contained within will remain uncorrupted when being stored for an extended period of time.

20

## **CONCLUSION**

Based on the information listed above, I submit that there is probable cause to believe that CROSSWELL, CASTRO, ORTEGA and other known and unknown associates have committed violations of criminal statutes including, but not limited to, possession with the intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1). Also, I believe evidence, fruits and instrumentalities of the foregoing violations, as particularly described in Attachment B, can be found in **TD #1, TD #2, TD #3, TD #4, TD #5,** and **TD #6** which is particularly described in Attachment A.

Wherefore, I respectfully request that a warrant be issued authorizing any authorized law enforcement officer to enter and search the devices described in Attachment A for the items listed in Attachment B.

I swear under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

DANIEL J
THOMAS

Digitally signed by DANIEL J
THOMAS
DN: cn=DANIEL J THOMAS,
o=U.S. Government, ou=People,
email=Daniel.J.Thomas@ice.dhs
.gov, c=US
Date: 2022-09-28T15:53:50-0700

_____
Daniel J. Thomas, Special Agent
Homeland Security Investigations

Subscribed and sworn telephonically this 30ᵗʰ day of September, 2022.

M Morrissey

_____
Honorable Michael T. Morrissey
United States Magistrate Judge

21